**Commonwealth v. Henry**

C.P. of Montgomery County, No. CR-7724-12; 3559 EDA 2013

*Thomas W. McGoldrick,* for Commonwealth.
*Craig Hosay,* for defendant.

SMYTH, *J.,* July 18, 2014—

Michael Joseph Henry is not himself a "cop killer." However, by heavily and repeatedly arming one, he contributed to a cop killing, if not in the strictly legal sense of an accomplice, then as a substantial factor, and his crimes led, predictably, to the death of one mourned by his family, community, and region and praised as one of our nation's finest.

This is Henry's appeal to the Superior Court of Pennsylvania from judgments of sentence totaling twenty to sixty-six years in prison imposed on him following his open pleas of guilty to charges arising from his acting as a "straw man" to illegally purchase nine firearms on behalf of a man Henry knew was not authorized to possess them. The man to whom Henry transferred the guns later ended up killing a police officer with one of them, as the man had warned Henry might happen. Henry's appeal contests the total length and discretionary aspects of this lower court's sentences.

Represented in this matter by the Montgomery County Public Defender, Henry pled guilty to the following crimes:

(A) nine counts of intentionally or knowingly making a materially false written statement in the purchase of a firearm under the Pennsylvania Uniform Firearms Act of 1995, 18 Pa.C.S. § 6111(g)(4)(ii), a third-degree felony for which the Crimes Code, 18 Pa.C.S. § 1103(3), prescribes a maximum sentence of seven years in prison; (B) seven counts of intentionally or knowingly transferring a firearm in violation of 18 Pa.C.S. § 6111(g)(1), a second-degree misdemeanor with a maximum sentence of two years in prison, 18 Pa.C.S. §1104(2); and (C) seven counts of unsworn falsification to authorities under 18 Pa.C.S. § 4904(b), a third-degree misdemeanor with a maximum of one year in prison, 18 Pa.C.S. § 1104(3). After accepting the pleas as knowingly, voluntarily, and intelligently tendered, this court ordered presentence investigative reports under Pa.R.Crim.P. 702(A), (B) (Open Guilty Plea Tr. 25, Mar. 12, 2013) and upon receiving them from the County Probation/Parole Department in June 2013 set the case down for sentencing August 15, 2013.

On August 6, 2013, we notified the parties that due to the large crowd of people expected to attend the sentencing hearing, we had moved it from our regular courtroom in the Montgomery County Courthouse to a larger one, Courtroom "A." No party registered an objection on the record, either before or at the sentencing proceeding, to its being held in Courtroom "A."

At sentencing, the court commenced by asking if the parties had any objections or corrections to the psychiatric/psychological evaluations (PPI) or to the presentence investigative report (PSI), the latter of which had attached to it copies of letters from the slain officer's brother, mother, and widow. Without objection, we admitted the PSI into the record. (Sentencing Tr. 4, Aug. 15, 2013.)

To outline for the Superior Court in narrative form basic undisputed facts and circumstances surrounding the case, we quote from the PSI (which itself quotes from the police affidavit of probable cause):

On Thursday, September 13, 2012, at 5:16 PM, [o]fficers from the Plymouth Township Police Department were investigating a [three-vehicle] accident at 1215 East Ridge Pike in the Conshohocken section of Plymouth Township.

While conducting traffic control at the accident scene, Plymouth Township Police Officers observed [an Infiniti SUV] operated by the suspect [sic], Andrew Thomas, traveling eastbound at a high rate of speed on Ridge Pike. The vehicle was passing stopped traffic in the opposing lane of traffic.

At 5:42 PM, Plymouth Township Police Officer Bradley Fox, and assisting officers, followed the Infiniti SUV from Ridge Pike onto southbound Conshohocken Road. While travelling on Conshohocken Road, the Infiniti struck a [sedan]. Following this crash, Officer Fox observed that the Infiniti sedan [sic] travelled onto Ernest Station Road[,] where the suspect abandoned the vehicle. Officer Fox and his K9 partner pursued Thomas into an industrial area[,] where Thomas fired multiple gunshots at Officer Fox. Officer Fox was struck by gunfire and transported to Montgomery Hospital[,] where he was pronounced dead.

Plymouth Township Police Officers, assisted by responding law[-] enforcement officers, set up a perimeter and began to search the area for the perpetrator. During a K9 search of the area, the body of Andrew Thomas was discovered in a field adjacent

to Ernest Station Road. A Beretta 9mm [p]istol, serial number BER593388[,] was found next to his body.

The Montgomery County Detective Bureau initiated an investigation into the homicide of Officer Bradley Fox.

. . .

Montgomery County Detective John Finor, a member of the Forensic Services Unit and an expert in the field of [b]allistics and [f]irearms [i]nvestigation, processed the crime scene. Detective Finor recovered fired 9mm shell casings and fired bullets in proximity to the location where Officer Fox was mortally wounded and in the area where Andrew Thomas['s] body was found. Following ballistics examinations, Detective Finor opined that the recovered fired shell casings and fired bullets were consistent with being fired from the Beretta 9mm pistol bearing serial number BER593388 recovered next to Thomas['s] body.

The Infiniti SUV was also searched during the crime scene investigation. Detectives examined the Vehicle Identification Number (VIN) and learned that the Infiniti was reported stolen on April 8, 2010, from an automobile dealership in Lower Providence Township, Montgomery County. No additional firearms were recovered during the search of the Infiniti SUV.

On Friday, September 14, 2012, Doctor Erica Williams, a [f]orensic [p]athologist, performed an autopsy on the body of Officer Bradley Fox. Following the autopsy, Doctor Williams opined that Officer Fox died as a result of a gunshot wound to the head and that the manner of death was homicide.

On Friday, September 14, 2012, Doctor Erica Williams performed an autopsy on the body of Andrew Thomas.

Following the autopsy, Doctor Williams opined that Thomas died as a result of a gunshot wounds to the chest and that the manner of death was suicide.

On Friday, September 14, 2012, Montgomery County Detective Christopher Kuklentz interviewed Jeanette Thomas at 105 Grasmere Road, Lower Merion Township, Montgomery County, PA. Jeanette Thomas is the mother of Andrew Thomas. Jeanette Thomas told detectives that she resides with her son Andrew Thomas at 105 Grasmere Road. She said that she last saw Andrew Thomas in the afternoon of Thursday, September 13, 2012, when he left her home. Jeanette Thomas consented to a cursory search of the residence. During that search, detectives recovered a cellular phone[,] which Jeanette Thomas identified as being owned by her son Andrew.

On Friday, September 14, 2012, Lt. McGowan obtained the Montgomery County Adult Probation file of Andrew Thomas. The file revealed that Thomas listed his home address at 105 Grasmere Road, Bala Cynwyd, PA. Thomas was on [p]robation for a 2005 [f]orgery arrest by the Upper Merion Township Police Department.

On Friday, September 14, 2012, Montgomery County Detective Lieutenant James McGowan contacted the Pennsylvania State Police regarding ownership of the Beretta 9mm [p]istol, serial number BER593388. Lt. McGowan learned that the firearm was purchased on May 30, 2012, and that the firearm was registered to Michael Joseph Henry. Lt. McGowan also learned that the firearm was not reported stolen.

On Friday, September 14, 2012, Montgomery County Detectives Michael Begley and James Carbo interviewed

Michael Joseph Henry. Henry told detectives that he was introduced to Andrew Thomas in April 2012 and that he started to "straw purchase" firearms for Thomas shortly thereafter. Henry said that, in exchange for the purchase of the firearms, Thomas would pay him a cash payment of $500.00 in addition to providing him with the cash for the firearm purchase. Henry detailed the "straw purchase" of [nine] firearms which were registered in his name and delivered directly to Andrew Thomas. Henry said that these "straw purchases" were made at In Site Firearms in Montgomery County and at French Creek Outfitters in Chester County. Henry told detectives that he was unaware of the current location of the firearms[,] which he last saw in the custody of Andrew Thomas.

Henry told detectives that he had discussed with Andrew Thomas the possibility of being stopped by the police. During the conversation, *Thomas said that, if he was stopped by the police, he would run and that he wasn't going back to jail. Andrew Thomas told Henry that he "wouldn't go alive" and that he "would shoot a cop[."]*

On Saturday, September 15, 2012, Lt. James McGowan obtained records from In Site Firearms [in Montgomery County]. The records noted the following purchases made by Michael Henry:

In Site Firearms:

April 19, 2012     Colt .45 ACP Serial # GCT34231

May 3, 2012     Colt .45 ACP Defender Serial # DR47133

May 30, 2012     Beretta 92 FS Pistol Serial #

BER59388 (Homicide Weapon)

May 30, 2012     Remington 750 30-06 Rifle Serial # D8044546

June 21, 2012     Colt Mustang .380 ACP 7 3/4" Barrel Serial # PL73263

July 31, 2012     Stevens 200 Rifle 300 Winchester Serial # G602244

On Monday, September 17, 2012, Montgomery County Detective James Carbo obtained records from French Creek Outfitters [in Chester County]. The records noted the following purchases made by Michael Henry:

French Creek Outfitters:

April 10, 2012     Beretta 92FS 9mm Pistol Serial # BER61887

April 14, 2012     Beretta 92FS INOX 9mm Pistol Serial # BER596082

May 5, 2012     Fabrique Nationale 57 5.7X28 Pistol Serial # BER386231002

For each purchase Michael Henry made on behalf of Andrew Thomas, Michael Henry indicated on the Application/Record of Sale that he purchased the firearm for himself, and not another individual. Henry purchased these items for Andrew Thomas, making materially false statements on the Application/Record of Sale issued by the Pennsylvania State Police. Additionally, Michael Henry is not a licensed firearms dealer.

(Presentence Investigation Report 2-6 (emphasis added).) For the record, aside from the murder weapon, police never found any of the other eight guns that Henry illegally

purchased for Thomas and transferred to him. (Sentencing Tr. 14-15 (testimony of Det. James Carbo).)

The PSI depicted Henry's statement regarding the offenses as follows:

The defendant was introduced to Andrew Thomas by John Selser in April 2012. The defendant knew John from them both attending the Parkside Methadone Clinic in Philadelphia. The defendant said that he only had contact with Thomas when he purchased firearms for him. He admitted to purchasing all of the aforementioned firearms for Thomas listed in the affidavit of probable cause. He used the money, $500 per firearm purchase, to support his drug addiction. At the time, he was not using heroin due to being on methadone, but was using a lot of Xanax and Klonopin (benzodiazepines), which he said gave him a good high when used with methadone.

The defendant said that Andrew Thomas seemed really paranoid and made him uncomfortable. He tried to "get out" from buying him firearms *but Thomas told him he was "in too" because he had already purchased firearms for him, which he took as a threat. The defendant said that Thomas never told him directly that he would kill a cop instead of going to jail, but rather Selser told the defendant that he said it to Selser.*

The defendant said that he is sorry for the death of Officer Bradley Fox. He wishes to address the court at the time of sentencing.

(Presentence Investigation Report 6 (emphasis added).)

In addition to reviewing and taking into consideration the PSI, *see generally Commonwealth v. Devers*, 519 Pa.

88, 102, 546 A.2d 12, 18 (1988) ("A pre-sentence report constitutes the record and speaks for itself. . . . Having been fully informed by the pre-sentence report, the sentencing court's discretion should not be disturbed."), this court at the sentencing hearing took testimony and evidence from the following sources: for the Commonwealth, testimony from investigating Detective James Carbo, from Officer Bradley Fox's widow, mother, brother, and father, and from the Plymouth Township Chief of Police; and exhibits consisting of a written record of the Montgomery County Detectives' interview with Henry, and photographs and a partial video of a ceremony in which President Barack Obama recognized Officer Fox along with other officers from around the country killed in the line of duty; and for defendant, testimony from his sister and from a therapist familiar with him; and exhibits consisting of photographs and letters written to him (by his daughter) or in his support. In addition, the parties stipulated that if called as a witness Detective John Finor, an expert in ballistics and identifying firearms, would testify that the Beretta pistol found next to Thomas's body at the scene of the murder-suicide was the one Henry had purchased from In Site Firearms May 30, 2012, and transferred to Thomas later that day, and that the bullets and shell casings found at the scene were consistent with having been fired from that weapon. (Sentencing Tr. 6-8.)

As in the case of the PSI, the defense placed no objections on the record to any of the Commonwealth's evidence; in fact, as the exhibits were introduced at the close of the Commonwealth's case-in-chief, counsel stated, "The defense has received each one. We have no objection to them being entered into evidence." (Sentencing Tr. 87:21-23.)

With the presentation of evidence concluded, the court entertained the closing arguments of counsel, and

also received the parties' memoranda of law on issues of sentencing merger. Defendant then exercised his right to allocution, apologizing to the Fox family for his actions, citing his troubled past and drug addiction, and invoking the mercy of the court. (Sentencing Tr. 146-50.)

The court recessed briefly to review the defense's newly-presented legal memo and final exhibits, then returned to the courtroom to pronounce sentence, placing reasons for the sentence on the record in accordance with the Sentencing Code, 42 Pa.C.S. § 9721(b), the sentencing guidelines, 204 Pa. Code § 303.1(d), and the Pennsylvania Rules of Criminal Procedure, Pa.R.Crim.P. 704(C)(2), as follows:

> After reviewing the memorandum of law, I believe the doctrine of merger does not apply to the felony three and the misdemeanor three, the felony three's and the misdemeanor three's, in this particular case. Even if it did, I don't think it would really upset my sentencing scheme to any great degree.

> As we stated on the record, the standard range of the guidelines for the felony three is nine to sixteen months with an aggravated range of up to twenty-five months. The maximum the court can impose by law is three and a half to seven years.

> Now, in exercising its discretion, the court may deviate from the guidelines, if necessary, to fashion a sentence which takes into account the protection of the public, the rehabilitative needs of the defendant, [and] the gravity of the particular offense as it relates to the impact on the life of the victim and the community so long as the court states of record the factual basis and specifically reads which compels the court to go

beyond the sentencing guidelines.

I'm first going to sentence him on I believe count six, which is the felony three, count fifteen, which is the misdemeanor two, and county twenty-three, which is the misdemeanor three; is that correct?

Because they are the three counts that relate directly to the gun that was used in the death of Officer Fox.

Now, it can be said that or it can be argued that the defendant never intended that this gun be used to kill an American hero, and make no mistake about it, Officer Fox is a true American hero. But my analysis takes into [account] the fact that people can be killed that aren't heroes and every life is precious as far as I'm concerned when I impose sentence today.

On the felony three, count six, I'm imposing a sentence of three and a half to seven years in a State Correctional Institution to date from [October 10th].

On count fifteen, the misdemeanor two, I'm going to impose a sentence of one to two years consecutive to that imposed on count six.

And on count twenty-two, the misdemeanor three, I'm imposing a sentence of six months to a year consecutive to that imposed on count fifteen.

So [by] my calculations that's sixty months right there. Sixty months, seven plus two, plus one, basically [is] five to ten years.

Now, when I get into the remaining sentences - oh, my reason for doing that, is in the facts of this case, I find that the defendant did, in fact, know that the guns would be used to kill by Andrew Thomas, that if he was

ever stopped by the police. He knew Andrew Thomas was not authorized to have a gun. He was a convicted felon. He knew that Andrew Thomas said he would never go back to jail. He knew that Andrew Thomas said he would shoot a cop and Andrew Thomas did, in fact, shoot a cop. I think they are sufficient reasons to deviate from the guidelines.

But I think there are other reason[s] to deviate as well. I will get into that when I discuss the remaining bills of information involving the felony three's and that would be counts one, two, three, four, five - I've already sentenced him on six - count seven, count eight[,] and count nine.

Now, an argument I suppose could have been made, gee, only one of those guns could have been used to kill the cop. We didn't know that the other guns were going to kill a police officer. But the thing that struck me when I read through these statements, as I look to the statement presented in the evidence by the first witness, "Did you have a conversation with Andrew in his car about being stopped by the police?"

"ANSWER: Yes. He said that he was stopped by the police. He was running. He wasn't going back to jail. He said he would not go alive and he would shoot a cop."

Fine. I've already discussed those - - some of my reasons for deviating from the guidelines with the sentence I just imposed.

But if you look at the question or two questions above that, "Where did Andrew store the guns?"

"ANSWER: He wouldn't tell me. He didn't trust me. He was paranoid."

Then I go to the PSI where here the defendant said -- in the PSI, he said, Thomas never told him directly that he would kill a cop instead of going to jail; but rather the fellow that introduced him to Thomas said he would kill a cop.

Now, that's an inconsistency with the statement that he gave to the detective. A lot of argument has been made about what an honest person the defendant is. Well, he did not tell the truth when he committed these crimes, and he either didn't tell truth when he talked to the detective or he didn't tell the truth when he was answering the questions in this PSI.

But the thing that jumped out at me was when he said that the defendant [sic], Andrew Thomas, seemed really paranoid and made him uncomfortable. The defendant said he tried to get out from buying his firearms but Thomas told him he was, quote, in, too, close quote, because he had already purchased firearms for him which he took as a threat.

Now, here is a chance that he has to get out of it, and he says he is trying to get out of it. He is not so controlled by the drug addiction anymore that he wants to continue selling him drugs [sic]. Regardless of that control, he wants to get out of it. But he won't get out of it because he is afraid because he, too, might be arrested and he's afraid of Andrew Thomas because he appears to be paranoid.

So that's not a person who's continuing to buy these guns because of this uncontrollable drug addiction. That's the statement of a person who doesn't care, doesn't care about himself, doesn't care about anybody else.

And when you consider the fact that Andrew Thomas

said, I'm not going to be taken alive, I'll shoot a cop, this defendant is supplying guns to someone who is suicidal and who he thinks is paranoid and he is arming this person to the teeth. And that's what happens in these mass shootings. These people buy multiple guns. They kill lots of people and they wind up killing themselves or they keep shooting people until they g[e]t shot.

That didn't happen in this case. But there's certainly the possibility of that happening when you are selling to someone who says they're not going to take me alive and I'm going to shoot a cop and you think he is paranoid. You are giving guns to a paranoid person who is suicidal. I find that to be an aggravating factor.

And as the District Attorney pointed out, he placed all of these guns into the underground market, which usually is frequented by criminals because they can't buy guns and they usually do wind up in the commission of murders and robberies or burglaries or other crimes of violence.

So for those reasons, I am going to impose the following sentences: On count one, twenty-two months, fifteen days to seven years and that's to run consecutive to count twenty-three.

Count two, three, four, five[,] seven, eight, nine, the same sentence that I just imposed on count one and all to run consecutive with one another. I compute that to be twenty to sixty-six years.

On the misdemeanor two's, count one [sic], two years probation commencing today; counts ten, eleven, twelve, thirteen, fourteen, and sixteen, they are all two years probation consecutive to one another and consecutive to count one [sic].

On the misdemeanor three, count seventeen, one year probation consecutive to that imposed on count sixteen.

On counts eighteen, nineteen, twenty, twenty-one, and twenty-three all consecutive one[-] year probations consecutive to one another and consecutive to that imposed on count seventeen.

All right. Thank you, gentlemen.

(Sentencing Tr. 150:19-158:17.)

Defendant, through the Public Defender, filed a post-sentence motion under Pa.R.Crim.P. 720(B) seeking to modify the aggregate sentence of total confinement of twenty to sixty-six years as harsh and excessive. (Post-Sentence Mot. para. 2.) The Commonwealth filed an answer opposing the motion.

On December 3, 2013, the court entered an order denying the motion to modify sentence. On December 5, 2013, we filed an amended order that complied with the requirements for the content of such an order set forth in Pa.R.Crim.P. 720(B)(4). This appeal followed.

Under the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 1925(b), we ordered the Public Defender to file a concise statement of errors complained of on appeal. The Public Defender responded by filing a 1925(b) statement raising ten separately-paragraphed claims about why the aggregate twenty- to sixty-six-year sentence of imprisonment imposed was harsh and excessive punishment for the specific offenses of which defendant was convicted and abused the court's sentencing discretion. (Concise Statement para. 1(a)-(j).) We will address these issues in the order they are presented. None provides grounds for disturbing the sentence on appeal.

The first claim raised in the 1925(b) statement is that,

a. The learned trial court abused its discretion when it permitted the Commonwealth, *over defendant's strenuous objections*, to present victim impact and other testimony and physical evidence regarding the murder of Plymouth Township Police Officer Bradley Fox where defendant was not charged with any offence directly connected to Officer Fox's murder, either as an accomplice, co-conspirator, or accessory before or after the fact, making such testimony and evidence irrelevant. A trial court's consideration of irrelevant factors during sentencing constitutes both an abuse of discretion and a denial of due process of law.

(Concise Statement para. 1(a) (emphasis added).)

Our first response to this argument is that the "strenuous objections" we have highlighted in the passage quoted from the concise statement did not exist. We have reviewed the record of the sentencing hearing again in painstaking detail, and find, in accordance with our recollection, that defendant placed no objections whatsoever on the record to any of the evidence presented by the Commonwealth. (Sentencing Tr. 8-88.) The only contest defendant made to any of the Commonwealth's evidence was to cross-examine one of the Commonwealth's six witnesses, Detective Carbo. (Sentencing Tr. 15-38.) In particular, defendant made no challenge to the evidence concerning the circumstances of Officer Fox's murder or the fact that defendant had illegally procured the murder weapon and transferred it to the perpetrator knowing that he might use it to "shoot a cop"; nor did defendant object on the record in any way to the testimony of the Commonwealth's five witnesses (his family and chief of police) who testified exclusively about their experiences with Officer Fox,

including his father's testimony about the presidential memorial service honoring fallen officers and the video and photos of that service the Commonwealth displayed. In fact, 1) the Public Defender explicitly allowed the court to enter the PSI into the record without objection; that document contained a detailed account of the circumstances surrounding the officer's murder and of defendant's acquainting with the murderer and supplying him with the murder weapon, as well as the Fox family's victim-impact letters; 2) the Public Defender *stipulated* to the testimony of Detective Finor that the murder weapon found at the crime scene near the murderer's body was the same Beretta pistol defendant had illegally bought for the murderer on May 30, 2012, and transferred to him the same day; and 3) and the Public Defender explicitly did not object to admission into evidence of the Commonwealth's exhibits, which included the photos and brief video clip of the presidential memorial service introduced during the testimony of Officer Fox's father, stating, "The defense has received each one. We have no objection to them being entered into evidence." (Sentencing Tr. 87:21-23.)

Where a defendant fails to object specifically and contemporaneously to evidence admitted and considered by the sentencing court, he waives on appeal any claim the evidence was improperly admitted or considered. Cf. *Commonwealth v. Sanchez*, 82 A.3d 943, 968-72 (Pa. 2013) (finding waived on appeal several claims of error not raised by specific contemporaneous objection placed on the record at capital trial and sentencing proceedings), *petition for cert. filed*, No. 13-10660 (U.S. June 16, 2014). A party may not revive on appeal an issue waived below by raising the issue in a concise statement of matters complained of on appeal. *See, e.g., Commonwealth v. Melendez-Rodriguez*, 856 A.2d 1278, 1287-89 (Pa.

Super. Ct. 2004) (en banc) (unanimous opinion) (holding defendant who fails to object timely and specifically in trial court cannot preserve the issue for appellate review by including the issue in a concise statement of matters complained of on appeal).

In support of the argument that we erred in allowing the Commonwealth "to present victim impact and other testimony and physical evidence regarding the murder of Plymouth Township Police Officer Bradley Fox" (Concise Statement para. 1(a)) the concise statement cites *Commonwealth v. Smithton*, 429 Pa. Super. 55, 631 A.2d 437 (1993), for the proposition that a sentencing court improperly heard victim-impact testimony from victims of offenses of which the defendant was acquitted, thereby abusing its discretion by hearing irrelevant evidence and requiring vacation of sentence and remand for resentencing; and *Commonwealth v. Smart*, 387 Pa. Super. 518, 564 A.2d 512 (1989), *appeal dismissed*, 527 Pa. 405, 592 A.2d 683 (1991), for the proposition that a sentencing court improperly considered more serious offenses of which the defendant had been acquitted, thereby creating the impression the defendant was being sentenced for offenses of which he was found not guilty, requiring vacation and remand. (Concise Statement para. 1(a).) Unlike in *Smithton* and *Smart*, no finder of fact acquitted defendant of any crimes related to the murder of Officer Fox, and therefore there are no necessary findings of fact inconsistent with the court's consideration of the Officer's death as an unfortunate but foreseeable consequence of defendant's commissions of the crimes of which he was convicted.

We find more pertinent the argument made in the Commonwealth's memorandum of law submitted before sentencing. The Commonwealth acknowledges there is little case law relating to sentencing for the "straw purchase"

of firearms, although we note that the United States Supreme Court recently affirmed the conviction under the federal Gun Control Act of 1968, 18 U.S.C. § 922(g), of a straw purchaser of a firearm who falsely answered "yes" on a federal form to a question whether he was the actual purchaser of the gun when he was actually buying it for his uncle, even though the uncle could have legally purchased the weapon himself. *Abramski v. United States*, 134 S.Ct. 2259 (2014). The Commonwealth, however, analogizes persuasively to the case of *Commonwealth v. Curran*, 932 A.2d 103 (Pa. Super. Ct. 2007). There the Superior Court affirmed the maximum sentence allowed by law for furnishing alcohol to a minor for a woman with no prior convictions who bought numerous cases of beer for an underage friend. The friend provided the beer at a party, and another young man consumed some of the beer before getting behind the wheel of his car and driving it into a tree, killing two passengers. In justifying the maximum sentence for the crime of which the woman was convicted, the trial court analyzed extensively the chain of events the woman helped set in motion leading to the death of the two passengers, finding that tragic outcome foreseeable in the circumstances, even though she was not charged with any offenses directly stemming from the deaths. In affirming the maximum sentence, the Superior Court quoted extensively the sentencing court's analysis to the effect that the foreseeability of a series of criminal acts by other parties made more likely by the defendant's conduct warranted punishing her crime more severely. 932 A.2d at 106-07.

We find Curran more apropos to defendant's case than *Smithton* and *Smart*, in which the sentencing court considered crimes of which the defendant was acquitted in fashioning sentence. Even more so than in *Curran*,

defendant had specific information about the dire consequences to which his crimes might lead - defendant bought guns for a man who seemed paranoid and said he would kill a cop - which he in fact did with one of the guns defendant supplied him. Would the law allow increased penalties for one who illegally obtained nuclear material and purveyed it to known terrorists who later used it to kill people with a "dirty bomb," even though the seller had no direct involvement in or prior knowledge or intent with respect to the specific killing that occurred? We find the situation comparable, and believe the law does allow a sentencing judge to take into account the foreseeable consequences of the particular crimes being sentenced, even if those consequences constitute other crimes in which the person being sentenced had no active or intentional participation.

The concise statement next contends,

b. The learned trial court permitted a circus atmosphere to prevail at the sentencing proceeding by permitting the media to sit in the jury box and scheduling the proceeding for a special court room that could accommodate the large number of police and other law enforcement persons expected to be present, the presence of both of which unduly influenced the trial court, either directly or subconsciously, to impose a harsher sentence, which was clearly evident when the law enforcement visitors broke into applause when the court finished imposing sentence[.]

(Concise Statement para. 1(b).)

As we have pointed out, defendant never placed on the record an objection to the courtroom in which the sentencing was held, nor did he preserve an objection to a "circus atmosphere" or the location where the spectators

were seated. This issue is waived.

Moreover, the scheduling of sentencing in a courtroom larger than the one in which the undersigned regularly presided was not an abuse of our discretion. Courtroom "A," though larger than ours, was simply an available courtroom in the Montgomery County Courthouse in which we, as well as most other judges of the Court, had commonly conducted proceedings when circumstances called for it.

Had we, having been alerted to the likelihood of a large crowd at sentencing, allowed it to go on in a smaller venue, no doubt the courtroom would have been packed to the gills and spilling into the surrounding halls and vestibules with press, police officers, and members of the general public, not to mention the numerous witnesses, supporting staff of the parties, and personnel of the Court necessary to the proceeding. With too many people both inside and outside the courtroom for the Court and Sheriff's Department to exert control over events, a true "circus atmosphere" could have broken out. The spectators who did attend the proceeding in the larger courtroom procured to accommodate them were orderly and caused no disruption in the proceedings whatsoever. Although some of them stood, the more spacious courtroom was adequate to contain the entire crowd comfortably, without placing any undue pressure on the parties or other participants involved in the proceedings. The number or identity of people within the physical constraints of the courtroom did not influence the Court's sentencing decision. The claim that the Court erred in rescheduling sentencing for a courtroom that could contain the expected crowd is meritless.

The next two issues in the concise statement raise matters that this Court allegedly "totally discounted" or "ignored," and as our response to them is the same, we

shall address them together:

> c. The learned trial court violated the mandate of 42 Pa.C.S. § 9721(b) where it totally discounted the uncontested evidence of defendant's substantial cooperation with law enforcement following his identification to track down the purchasers of the firearms sold by defendant;

> d. The learned trial court ignored the fact that [defendant] accepted complete responsibility for his actions; cooperat[ed] with law enforcement to a considerabl[e] degree; waiv[ed] his preliminary hearing; [did] not fil[e] any pre-trial motions; pled open to all charges; and even offered to meet with the family of Officer Fox to afford the family the ability to privately express any feelings that they may have had and to assist them in achieving some degree of closure[.]

(Concise Statement para. 1(c)-(d).)

These overlapping, stream-of-consciousness claims misstate the case; we neither "totally discounted" nor "ignored" any evidence, whether uncontested or not, although we certainly disagree with the statement's characterization of some of the evidence. For example, the assertion that defendant "accepted complete responsibility for his actions" is a biased rendition of the facts with which the Court did not concur, based on all the evidence presented. Yes, defendant cooperated with law enforcement to some degree to attempt to "track down" the numerous guns he had recklessly thrust into the black market in the hands of a man who was admittedly "paranoid" and inclined to "shoot a cop." But he did so only after this man had tragically fulfilled his prophecy and killed Officer Fox, and after detectives discovered through their own devices

defendant was the one who had purchased the murder weapon on the murderer's behalf. Even after defendant suspected, for good reason, the man was "paranoid" and a potential "cop killer," defendant did not come forward with the fact that he had supplied the man with numerous guns, enough to go on a rampage and kill untold numbers of people. No, defendant refused to "get out" of buying weapons for the man, despite supposed reservations about doing so, because the man told defendant he was "in too," hence raising the specter that defendant himself would be held criminally liable should be refuse to accede to the future killer's irrational wishes. Defendant did not own up to his culpability until after Officer Fox was dead, defendant was discovered as the illicit supplier of the murder weapon, and the eight other firearms disappeared to who knows where, perhaps into the clutches of persons planning other acts of mayhem against society.

In countering assertions that we "discounted" or "ignored" factors that defendant would have preferred we give heightened importance to in sentencing him, we again hark back to the words of the Pennsylvania Supreme Court in *Devers*, a seminal decision on the duties of the Pennsylvania sentencing jurist:

> In order to dispel any lingering doubt as to our intention of engaging in an effort of legal purification, we state clearly that sentencers are under no compulsion to employ checklists or any extended or systematic definitions of their punishment procedure. Having been fully informed by the pre-sentence report, the sentencing court's discretion should not be disturbed. This is particularly true, we repeat, in those circumstances where it can be demonstrated that the judge had any degree of awareness of the sentencing considerations, and there we will presume also that the

weighing process took place in a meaningful fashion. It would be foolish, indeed, to take the position that if a court is in possession of the facts, it will fail to apply them to the case at hand.

519 Pa. at 102, 546 A.2d at 18.

defendant next contends we abused our discretion in sentencing because, "defendant had a prior record score of zero (0) and his only prior offence was for driving under the influence (DUI)." (Concise Statement para. 1(e).) We were aware of defendant's prior record and prior record score, as they were reflected on the forms prepared for his case under the Sentencing Guidelines. "It would be foolish, indeed, to take the position that if a court is in possession of the facts, it will fail to apply them to the case at hand." *Devers*, 519 Pa. at 102, 546 A.2d at 18.

In *Curran*, the defendant who provided alcohol to a minor had no prior record, not even for the uncharged prior offenses of having done so on previous occasions. The sentencing court, however, found that because of those previous instances of having done the same thing, albeit in circumstances that ended up wreaking less harm, her spotless record had a "glaring exception," *Curran*, 932 A.2d at 103, and imposed on her for the crime of which she was convicted the maximum sentence allowed by law, which the Superior Court affirmed.

The next two claims again posit matters we allegedly "discounted and ignored," namely "defendant's [twenty-year] history of drug addiction and defendant's repeated, voluntarily seeking treatment for his drug addiction" (Concise Statement para. 1(f)) and "defendant's significant traumatic family history in that, by age [fourteen], he assumed the role of a father figure for his family and had been subject to physical abuse by his father, and forced to

leave school at the age of [sixteen] to become the bread-winner for his family" (Concise Statement para. 1(g)). We were aware of these factors in sentencing defendant. "[S]entencers are under no compulsion to employ checklists or any extended or systematic definitions of their punishment procedure. . . . It would be foolish, indeed, to take the position that if a court is in possession of the facts, it will fail to apply them to the case at hand." *Devers*, 519 Pa. at 102, 546 A.2d at 18.

Defendant next claims,

h. The learned trial court violated the sentencing norms and requirements of the Sentencing Code by counting the number of firearms involved in defendant's offences as an aggravating factor where each firearm involved was the subject of a separate and distinct set of charges to which defendant had pled guilty, thereby counting said offences against defendant twice[.]

(Concise Statement para. 1(h).)

To argue that a sentencing court may not consider the repeated and serial nature or sheer number of offenses being sentenced as an aggravating factor is not itself in keeping with the norms and requirements of the Sentencing Code. A prime example is the death-penalty provision of the Code, 42 Pa.C.S. § 9711, which allows, even mandates, consideration of other offenses, charged or uncharged, committed either prior to or together with the offense being sentenced, as factors elevating the penalty to be imposed from life in prison to death. *See, e.g.*, 42 Pa.C.S. § 9711(d)(6)-(7), (9)-(14). Closer to home, Pennsylvania's Uniform Firearms Act itself, as amended in 2012, effective after defendant committed his offenses, *requires* that the penalty for a second or subsequent violation of section 6111 (of which defendant was convicted sixteen times)

be raised to a *mandatory minimum* five years in prison. 18 Pa.C.S. § 6111(h)(1). Though the sentencing procedure reflected in this revised provision of the Uniform Firearms Act may have fallen into question on other grounds after *Alleyne v. United States*, 133 S. Ct. 2151 (2013) (majority opinion as to Parts I, III-B, III-C, and IV), our courts in interpreting and applying similar mandatory minimum statutes in Pennsylvania have held that each serial offense of which a defendant "has been convicted" (found guilty) and that is being sentenced at the same time constitutes a "second or subsequent" offense, so that no offense is "prior" to another and all are "second or subsequent" to each other, each ergo being subject to an enhanced mandatory minimum sentence and thus, in a way, being "counted twice." *See, e.g., Commonwealth v. Rush*, 959 A.2d 945 (Pa. Super. Ct. 2008) (applying mandatory minimum sentences for second or subsequent offenses under Drug Trafficking Sentencing Law, 18 Pa.C.S. § 7508, and concluding all offenses sentenced at the same proceeding are "second or subsequent" to each other and bear the enhanced mandatory minimum for a second or subsequent offense); *see also Commonwealth v. Vasquez*, 562 Pa. 120, 753 A.2d 807 (2000) (holding enhanced mandatory sentences for second or subsequent drug offenses apply to offenses sentenced at the same proceeding). Because the legislature has provided, in many mandatory minimum sentencing statutes, including those under the Uniform Firearms Act, that two or more offenses sentenced together may each be considered to enhance the penalty for the other, defendant's argument that this Court erred in considering each of the separate offenses being sentenced as an aggravating factor in imposing sentence for the others is, as the appellate courts have written to define the standard for granting allowance of appeal of the discretionary aspects of sentencing under

the Sentencing Code, 42 Pa.C.S. § 9781(b), "contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Raybuck*, 915 A.2d 125, 127 (Pa.Super.Ct. 2006) (McCaffery, J.).

Defendant's concise statement next maintains,

i. The learned trial court improperly focused on the death of Officer Fox, who was a decorated veteran of the United States Marine Corps and a dedicated police officer, when imposing sentence with respect to the first portion of sentencing where defendant's conduct only indirectly was connected to the death of Officer Fox and defendant was not charged with any offence directly relating to the murder of Officer Fox.

(Concise Statement para. 1(i).) We perceive this argument to be a reformulation of the first argument raised in the concise statement and addressed above. But for our discussion of the first issue's having been waived by defendant's failure to object to the Court's admitting the Commonwealth's evidence surrounding the death of Officer Fox, we rely on our discussion of the first argument to dispose of this one as well.

Finally, defendant claims,

j. The learned trial court ignored the fact that a period of more than [three] months had elapsed from the time defendant sold the Beretta pistol to Andrew Thomas and when the confrontation between Thomas and Officer Fox occurred that resulted in Officer Fox's death.

(Concise Statement para. 1(j).) As we said with respect to other issues above, the Court did no such thing as "ignore" the time period between defendant's transfer of the Beretta to Thomas and Thomas's cowardly murder of Officer Fox.

Moreover, rather than militate against the Court's sentence and for sentencing leniency, this argument may militate against such favorable consideration. Only time will tell, or it may never tell, whether the other weapons defendant sold Thomas will end up as the tools of other felons in the perpetration of other horrific acts. Whatever the unknown future consequences of his actions, defendant will be left to contemplate this particular one. We will not be adding to his sentence if other guns he illegally bought and sold end up in the news as instrumentalities of future tragedies, with new victims, new crimes, and new unwitting accomplices after the fact. The damage is already done; we tried to account for all the relevant factors raised in imposing an aggregate sentence of imprisonment we deemed just and fitting under the circumstances.

We did not abuse our discretion in sentencing defendant to an aggregate term of imprisonment of twenty to sixty-six years for the twenty-three crimes he committed in buying and selling nine firearms, including the murder weapon, to a known prospective--and as it turns out eventual--killer of a police officer, nor in considering that later crime as a foreseeable possible outcome of defendant's actions. We respectfully suggest that the honorable Superior Court should affirm the judgment of sentence.